## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **ALL LAND INVESTMENTS, LLC,** | : | |
| | : | Case No. 09-13790 (KJC) |
| Debtor | : | (Re: D.I. 80, 150, 155, 232) |

## MEMORANDUM[1]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

All Land Investments, LLC (the "Debtor) filed a petition for relief under chapter 11 of the United States Bankruptcy Code on October 29, 2009 (the "Petition Date").  On that same date, the Debtor filed a plan of liquidation and disclosure statement, which (among other things) proposed to deed certain real property to its secured creditors in a "dirt-for-debt" swap.[2]  An objection to the plan was filed by RBS Citizens, N.A. ("Citizens"), the holder of a first priority lien on substantially all of the Debtor's assets - - namely, a 412-lot, single family residential subdivision located in Clayton, Kent County, Delaware (the "Old Country Farm Subdivision").  The Debtor then filed an Amended Plan of Liquidation (D.I. 80, Ex. D-1)(the "Amended Plan")

---

[1]This Memorandum constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(G) and (L).

[2]A "dirt-for-debt" plan is one in which a chapter 11 debtor proposes to convey to a secured creditor its own collateral in full satisfaction of the creditor's claim. Ron C. Bingham II & D. Cooper Robertson, *Reconciling "Dirt-For-Debt" Plans with "Indubitable Equivalent" Standard*, 28-OCT Am. Bankr. Inst. J. 36, 36 (Oct. 2009) (hereinafter, "Bingham").  The debtor may try to confirm a chapter 11 plan over a secured creditor's objection by, among other things,  providing "fair and equitable" treatment of the secured claim. *Id.* citing 11 U.S.C. §1129(b)(1). In a "dirt-for-debt" context, "the 'fair and equitable' treatment issue turns on whether the secured creditor is deemed to receive the 'indubitable equivalent' of its secured claim." *Id.* citing 11 U.S.C. §1129(b)(2)(A)(iii). When the plan proposes to satisfy the secured claim by conveying only a portion of the creditor's collateral, the value of that portion of the collateral becomes critical to the court's "indubitable equivalent" determination. *Id.*

and Amended Disclosure Statement (D.I. 81) on January 21, 2010.  On February 26, 2010, the

Debtor filed a Second Amended Disclosure Statement (the "Discl. St.") (D.I. 99), which was

approved by Order dated March 4, 2010.  On April 12, 2010, Citizens filed an objection to the

Amended Plan, asserting that the Debtor's Amended Plan was filed in bad faith and failed to

meet the confirmation requirements set forth in Bankruptcy Code §1129.  The Debtor asserts that

the Amended Plan meets the "cram down" requirements for confirmation under Bankruptcy

Code §1129(b).  A hearing to consider confirmation of the Amended Plan was held on October 6

and October 21, 2010, at which the parties presented extensive testimony regarding the value of

Old Country Farm Subdivision.

On January 13, 2012, Citizens filed the "Motion to Allow the Admission of Additional

Evidence with Respect to the Objection of RBS Citizens to Debtor's Amended Plan of

Liquidation and the Motion of RBS Citizens for Relief from the Automatic Stay"(the "Motion

for Additional Evidence") (D.I. 232).   The Debtor filed an objection to the Motion for

Additional Evidence on February 7, 2012 and a hearing on the Motion for Additional Evidence

was held on February 14, 2012.

The following matters are before the Court for consideration:

(1)     Confirmation of Amended Plan,

(2)     Motion of Debtor for entry of an order authorizing the change of a ballot pursuant
        to Fed.R.Bankr.P. 3018 (the "Motion to Change Ballot")(D.I. 155),

(3)     Citizen's Motion for Relief from the Automatic Stay Pursuant to Section 362(d)
        of the Bankruptcy Code (the "Stay Relief Motion")(D.I. 150), and

(4)     Motion for Additional Evidence.

For the reasons that follow, the request for confirmation of the Amended Plan, the Motion

2

to Change Ballot, and the Motion for Additional Evidence will be denied.  The Stay Relief

Motion will be granted.

## FACTS

The Debtor is a Delaware limited liability company that was formed in November 2004

for the specific purpose of purchasing the real property known as the Old Country Farm

Subdivision located in Clayton, Kent County, Delaware.  (Discl. St. at 9).  The Debtor planned to

develop the Old Country Farm Subdivision in eight phases.[3]  (*Id.*).  The Debtor closed on 17

homes in the Old Country Farm Subdivision.  (Discl. St. at 10).  However, prior to the Petition

Date, the Debtor experienced a significant working capital shortage resulting primarily from the

slowing housing industry which caused a loss of liquidity, resulting in subcontractors failing to

continue to work, lenders ceasing to fund construction draws, and delays in the field, which

delayed closings.  (*Id.*)

**The Loan Agreements with Citizens**

On May 30, 2006, Citizens extended two loans to the Debtors.  The first was a land

acquisition loan in the original principal amount of Eleven Million Nine Hundred Twenty-Five

Thousand Dollars ($11,925,000.00) (the "Land Acquisition Loan").  The second loan included a

loan for land acquisition and site improvements in the original principal amount of Four Million

Eight Hundred Fifty Thousand Dollars ($4,850,000.00) (the "Second Land Acquisition Loan"),

and a letter of credit line of credit (the "Line of Credit") in the amount of One Million Five

---

[3]Those phases are: Phase 1 - Off Site Work, Phase 2 - 70 Building Lots, Phase 3 - 66 Building Lots, Phase 4 - 60 Building Lots, Phase 5 - 34 Building Lots, Phase 6 - 58 Building Lots, Phase 7 50 Building Lots, and Phase 8 - 74 Building Lots The Building Lots are defined and described in detail in Section 1.14 of the Amended Plan.

Hundred Thousand Dollars ($1,500,000.00).[4]

The Land Acquisition Loan is secured by a first priority mortgage (the "Land Acquisition Mortgage") on the Old Country Farm Subdivision (sometimes referred to as the "Mortgaged Premises"), the Debtor's primary asset. (*See* Citizens' Ex. 10; Tr. 10/21 at 48:22-25). The Second Land Acquisition Loan also is secured by, among other things, a mortgage against the Old Country Farm Subdivision ("Second Land Acquisition Mortgage"). (*See* Citizens Ex. 13; Tr. 10/21 at 49:20-25).[5]

The original letter of credit issued by Citizens under the Line of Credit has been replaced with three Irrevocable Standby Letters of Credit issued on April 8, 2009 in the aggregate face

---

[4]Citizens provided the Land Acquisition Loan to the Debtor pursuant to the terms of a loan agreement (the "Land Acquisition Loan Agreement") (*see* Citizens Ex. 9, Hearing Transcript 10/21/2010 (hereafter, Tr. 10/21") at 14:8-12, 48:6-18). The Land Acquisition Loan was evidenced by the Debtor's mortgage note dated May 30, 2006 in the original principal amount of $11,925,000.00 (the "Land Acquisition Note")(*see* Citizens Ex. 11, Tr. 10/21 at 49:11-15).

Citizens provided the Second Land Acquisition Loan and the Line of Credit to the Debtor pursuant to the terms of the Land Acquisition, Site Improvement, and Letter of Credit Loan Agreement (the "Second Land Acquisition Loan Agreement") (*see* Citizens' Ex. 12; Tr. 10/21 at 49:16-19), and evidenced by the Debtor's mortgage note dated May 30, 2006, in the original principal amount of $4,850,000.00 (the "Second Land Acquisition Note") (*see* Citizens Ex. 2).

The Land Acquisition Note and the Second Land Acquisition Note are referred to jointly as the "Mortgage Notes." The Land Acquisition Loan and the Second Land Acquisition Loan are referred to jointly as the "Loans." All of the documents evidencing the Loans, including but not limited to the Mortgage Notes, the Letters of Credit (described below), the Land Acquisition Loan Agreement, the Second Land Acquisition Loan Agreement, the Land Acquisition Mortgage, the Second Land Acquisition Mortgage, and any guaranties, are referred to herein as the "Loan Documents."

[5]Also on May 30, 2006, Huntington Development, LLC ("Huntington"), a debtor in chapter 11 case number 10-12461, executed a Guaranty and Suretyship Agreement (the "Guaranty") to guarantee and become surety to Citizens for payment of the Second Land Acquisition Loan. (*See* Citizens Ex. 3, Tr. 10/21 at 14:22-23; 46:7-21). To secure the its obligations under the Guaranty, Huntington pledged certain real property located on Wheatley's Pond Road, in Kent County, Delaware, known as the Huntington Mills Subdivision (the "Huntington Property"), as additional security for the Second Land Acquisition Mortgage Note. (*See* Citizens Ex. 1, Tr. 10/21 at 45:18-23).

4

amount of $1,043,966.50 (the "Letters of Credit").[6] (*See* Citizens Exs. 4, 5, and 6; Tr. 10/21 at 46:21 -47:20).

**Debtor's Default and Citizen's Claim Amount**

The Debtor defaulted on its obligations under the Loan Documents prior to March 2009. (*See* Tr. 10/21 at 54:5-11).  With the Debtor's consent, on June 23, 2009, the Superior Court of the State of Delaware in and for Kent County entered final judgments in favor of Citizens and against Debtor in the amounts of $11,470,386.67 and $3,086,975.70. (*See* Tr. 10/21 at 54:13-18; Citizens' Exs. 7, 14).

As of the confirmation hearing, the principal owing to Citizens under both Loans was $12,498,520.36. (Tr. 10/21 at 64:21- 65:8).   However, Citizens asserts that after adding in various fees (including, but not limited to, attorney fees, late fees, and appraisal fees) and interest due as of the confirmation hearing, the total amount owed by the Debtor to Citizens exceeds $14.7 million. (*See* Tr. 10/21 at 17:11-17, 51:4-53:20).

---

[6]The Letters of Credit are described more specifically as Letter of Credit Number S906835 in the face amount of $136,181.25; Letter of Credit Number S906836 in the face amount of $136,181.25; and Letter of Credit Number S906837 in the face amount of $771,604.00.  The beneficiary on all three Letters of Credit is the State of Delaware, Department of Transportation ("DelDOT"). (Citizens Exs. 4, 5, and 6).

At the February 14, 2012 hearing on the Motion for Additional Evidence, Citizens advised the Court that the Letters of Credit had expired without any draw by DelDOT.  The parties agreed to submit a fact stipulation as a supplement to the record now before the Court reflecting the expiration of the Letters of Credit.  However, in a telephone conference among the parties and the Court held on the record on March 7, 2012, Citizens advised that, subsequent to February 14, 2012, DelDOT attempted to draw on the Letters of Credit and, although Citizens' position is that the claim was made after the Letters of Credit expired, the possibility of litigation made it impossible for Citizens to stipulate that there are no obligations owing under the Letters of Credit.

However, even if Citizens' claim amount was either increased or reduced by the face amount of the Letters of Credit, the adjusted claim amount would not change my decision.

**The Amended Plan**

The Debtor's Amended Plan classifies claims and interests into six classes:

| | |
|---|---|
| Class 1 | Pre-Petition Real Estate Tax Claims and Other Secured Claims of Governmental Units, |
| Class 2 | Secured Claim of Citizens, |
| Class 3 | Secured Claim of KSJS Investment Associates, LLC ("KSJS"), |
| Class 4 | Priority Non-Tax Claims, |
| Class 5 | Allowed General Unsecured Claims, and |
| Class 6 | Holders of Interests. |

The Amended Plan classifies Classes 1, 2, 3 and 5 as impaired under the terms of the plan. (Ex. D-1, Art. II). Class 1 includes the $3,000 claim of the City of Clayton. (Ex. D-1, Ex. D-5). The City of Clayton holds an escrow account from the Debtor in the amount of $5,084.26 (D.I. 70, Amended Schedule B).

The Amended Plan proposes to pay Citizens' Class 2 secured claim by giving Citizens an option: (i) the Debtor will surrender the Citizens Collateral to Citizens by delivery of a deed on the Effective Date, or (ii) the Debtor will authorize Citizens to foreclose on the Citizens Collateral on the Effective Date.[7] (Ex. D-1, §3.2.3). The Amended Plan also provides that the Court will determine the value of Citizens' Collateral at the Confirmation Hearing and, to the extent the value of the Citizens Collateral does not satisfy the Citizens' Class 2 Claims, Citizens

---

[7] "Citizens Collateral" is defined in the Amended Plan as all of the Building Lots, except Building Lot No. 76, which is the KSJS Collateral. (Ex. D-1, §1.20, §1.62). Citizens disputes this definition, arguing that its collateral consists of much more than the Building Lots. Reference herein to the Old Country Farm Subdivision as "Citizens Collateral" (as used in the Amended Plan) is not a determination about whether Citizens' collateral is limited to the Building Lots.

will retain its rights and remedies for the balance due, after such credit, against the Debtors and

all non-debtor sureties and guarantors. (*Id.*).  The Amended Plan treats any deficiency claim held

by Citizens as a Class 5 Claim.  (*Id.*, §3.2.4).  However, "[i]f the value of Citizens Collateral

conveyed to Citizens as determined by the Court exceeds the Citizens debt, Citizens will retain

the excess and Citizens Class 2 Claim will be paid in full and it will have no further claim

against the Debtor." (*Id.,* §3.2.3).

    The Amended Plan provides that KSJS's Class 3 secured claim also will receive a deed to

its collateral in satisfaction of its secured claim.[8]  (Ex. D-1, §3.3.3).  Pursuant to the ballot cast by

KSJS, the Debtor lists KSJS's secured claim in the amount of $119,514.00.  (Ex. D-5).  The

Debtor values the KSJS collateral, Building Lot 76, at $185,900.00.  (D.I. 1, Schedule A Supp,

Ex. A-2).

    The Class 5 unsecured creditors of the Debtor, other than Citizens' deficiency claim,

include Frank Zeccola, Lawrence A. Zeccola, Sr., FLZ Development, LLC, Zeccola Building,

Inc. and Huntington Development, LLC.  (Ex. D-5).  The relationships between the Debtor and

these Class 5 unsecured creditors is as follows:

    (1)    Frank Zeccola is the Vice President/Director/Member of the Debtor and owns forty percent (40%) of the Debtor.  (*See* D.I. 1, Statement of Financial Affairs at item 21),

    (2)    Lawrence A. Zeccola, Sr. is the President/Director/Managing Member of the Debtor and owns forty percent (40%) of the Debtor.  (*See* D.I. 1, Statement of Financial Affairs at item 21),

---

[8]The "KSJS Collateral" is defined in the Amended Plan as Building Lot No. 76.  The KSJS Collateral originally consisted of Building Lots Nos. 75, 76, and 98.  However, as of the date of the Amended Plan, the homes on Building Lot Nos. 75 and 98 had been sold and conveyed to third party purchasers.  (Ex. D-1, §1.62).

(3)     FLZ Development, LLC is a limited liability company owned by Frank Zeccola and Lawrence A. Zeccola, Sr., who each own fifty percent (50%) of the company. (*See* Tr. 10/21 at 37:9-14),

(4)     Zeccola Builders, Inc. is a corporation owned by Frank Zeccola and Lawrence A. Zeccola, Sr., who each own fifty percent (50%) of the corporation. (*See* Tr. 10/21 Tr. 30:20-25), and

(5)     Huntington Development, LLC is a limited liability company owned by Frank Zeccola and Lawrence Zeccola, Sr., who each own a fifty percent (50%) interest in the limited liability company. (*See* Huntington Development LLC bankruptcy case docket (Bankr. D. Del. No. 10-12461) at docket no. 11, Statement of Financial Affairs at p. 10).

Solicitation packages containing the ballot, the Solicitation Procedures Order dated March 4, 2010 (D.I. 103), the Disclosure Statement, the Amended Plan, and a transmittal letter were sent to all classes. Under the terms of the Solicitation Procedures Order, the deadline for creditors to accept or reject the Plan was April 12, 2010.

Classes 1 and 3 voted to accept the Amended Plan. Moreover, all Class 5 unsecured claims, except Citizens and Crouse Brothers, Inc., voted to accept the Amended Plan. (Ex. D-5). Citizens submitted two Class 5 general unsecured claim ballots, in the amounts of $3,086,975 and $4,970,386.67, rejecting the Amended Plan. (*Id*). However, because the Amended Plan provides that the amount of Citizens deficiency claim would be determined at the Confirmation Hearing, the Debtor listed the amount of Citizens Class 5 claim as "unknown." (*Id.*).

On April 9, 2010, Crouse Brothers, Inc. ("Crouse"), holder of a Class 5 unsecured claim in the amount of $77, 267.60, submitted a ballot rejecting the Amended Plan.[9] (*Id.*). After the ballot submission deadline, KSJS purchased the Crouse claim pursuant to a Settlement

---

[9]Crouse submitted a ballot for a *secured* claim of $77,267.60 rejecting the Plan. The Debtor's Plan does not classify the Crouse claim as secured, so it treated the ballot as a class 5 ballot. (Ex. D-5 at 3 n.3).

Agreement between KSJS, Crouse, and the Debtor, approved by a June 30, 2010 Order of this

Court. (D.I. 138). After KSJS purchased the unsecured Crouse claim, the Debtor filed the

Motion to Change Ballot, asking the Court to allow the Debtor to count the revised ballot

submitted by KSJS as a Class 5 ballot accepting the Amended Plan. (D.I. 155).

**The Value of Citizens Collateral**

Prior to the Confirmation Hearing, the parties stipulated to the qualifications of two

experts offering appraisal testimony related to the value of Citizens Collateral: (i) Citizens'

expert, Michael J. Acquaro-Mignogna ("Mignogna"), and (ii) the Debtor's expert, Vincent D.

Quinn ("Quinn"). Mignogna testified that the market value of Citizens Collateral as of March

19, 2010 is Six Million Five Hundred Thousand Dollars ($6,500,000). (Citizens Ex. 18). Quinn

testified that the market value of Citizens Collateral as of January 21, 2010 is Sixteen Million

Five Hundred Fifty Thousand Dollars ($16,500,000). (Ex. D-8). Based on the experts'

testimony, I find as follows.

The Old Country Farm Subdivision - - description and location

The Old Country Farm Subdivision is a 412-lot, single-family residential subdivision

located on Underwoods Corner Road in Clayton, Kent County, Delaware. (Citizens Ex. 18,

Mignogna Report, at 2 (the "Mignogna Report")). From 2006 through 2008, the Debtor sold a

total of seventeen (17) lots. (Tr. 10/21 at 23:1-7.) In 2009, only two lots sold were sold, which

lots were subject to KSJS's liens. (Tr. 10/21 at 23:8-17.) The Debtor sold no lots in 2010. (Tr.

10/21 at 24:20-24.)

The Old Country Farm Subdivision currently has an unsold inventory of 392 lots.

(Mignogna Report at 2). Of the 392 remaining lots, 62 are "approved-improved" lots, and the

remaining 330 lots are "approved-unimproved" lots.  (*Id.*; Tr. 10/6 at 76).

The Debtor purchased the Old Country Farm Subdivision in 2005 as evidenced by a deed

dated September 30, 2005, (Mignogna Report at 9; Tr. 10/6 at 76),  reflecting consideration of

$16,980,000.00 for the Mortgaged Premises, which equates to $41,214.00 per lot.  (Tr. 10/6 at

76-77).

The Debtor offered fourteen model homes at the Old Country Farm Subdivision with

prices ranging from $210,900.00 to $271,900.00 exclusive of options, upgrades and premiums.

(Quinn Report, Ex. D-8, at 4).  The Debtor sold its first home at Old Country Farm in March

2007 and continued marketing homes until late 2009.  (Tr. 10/6 at 46 (Quinn)).  During this

period of time, the Debtor sold a total of 19 homes representing less than 5% of the available lots

at Old Country Farm. (*Id.*)

Old Country Farm is surrounded by the following competing residential subdivisions,

most  located within a three-mile radius.  As of the date of the expert reports, the competing

residential subdivisions had large inventories of unsold lots:

    (i)      Hickory Hollow is a competitive development located three miles east of Old

            Country Farm in Smyrna, Delaware.  Although 150 units are planned at Hickory

            Hollow, only 39 were sold and 111 units remained unsold.

    (ii)     Providence Crossing is a competitive development located one mile north of the

            Mortgaged Premises in Smyrna, Delaware.  Only 68 units out of a total of 180

            were sold leaving 112 units unsold.

    (iii)    A third competitive development, also known as Hickory Hollow, is being jointly

            developed by Ryan Homes and Gemcraft Homes three miles east of the

Mortgaged Premises.  A total of 65 units were sold and 260 units remained unsold.  Gemcraft had filed a bankruptcy petition.

(iv)    A fourth competitive development known as Jockey Hollow is located two miles southwest of the Mortgaged Premises in Clayton, Delaware.  Although 211 units were planned at Jockey Hollow, only 54 units were sold, leaving 157 unsold units.

(v)    Willowwood is a fifth competitive development located two miles east of the Mortgaged Premises in Smyrna, Delaware.  A total of ten units were sold at Willowwood, and 121 units remained unsold.

(Tr. 10/6 at 47-50 (Quinn); Quinn Report, at 20-36).

The competitive developments identified by the Debtor's appraiser have a total of 762 unsold lots.  (Tr. 10/6 at 50(Quinn)). When the 392 unsold lots at the Old Country Farm Subdivision are added to this total, it results in a total of 1,143 unsold lots within a three-mile radius of and including the Mortgaged Premises. (*Id.*).

The median effective household buying income or disposable income after federal taxes in Kent County was estimated to be $38,828, which was well below the state-wide average of $44,520.  (Quinn Report, at 10).    Further, the reported unemployment rate for Kent County in January 2010 was 9.7%, which was higher than the Delaware state-wide average of 9.0%. (Mignogna Report, at 20).

The residential housing market has experienced a severe and unprecedented decline with limited sales activity in the area of the Mortgaged Premises over the last three years.  (Tr. 10/6 at 42, 57 (Quinn)).  Consistent with this decline in the housing market,  the competitive housing developments within a three mile radius of the Mortgaged Premises showed limited sales activity

11

over the last twelve months.  (Quinn Report, at 32; Tr. 10/6. at 57-58(Quinn)).

The competitive housing developments identified above had per month sales over the last twelve months as follows:  Hickory Hollow (1.25);  Providence Crossing (.67); Hickory Hollow #2 (1.42); Jockey Hollow (.92); and Willowwood (.77). (*Id.*).

Both appraisers agree that the highest and best use for the property is for continued residential development of improved lots and future residential development of unimproved lots when market conditions warrant.  (Mignogna Report, at 68-69, Tr. 10/6 at 83-84 (Mignogna), Quinn Report at 47-49).

The Mignogna Appraisal

Mignogna prepared a written appraisal dated March 19, 2010 for the Old Country Farm Subdivision, utilizing both a sales comparison approach and a subdivision development analysis.

Mignogna's report assumes the overall cost to complete the infrastructure at the Old Country Farm Subdivision will be $8,403,000.00 which would be paid by any future purchaser of the property.  (Mignogna Report at 2; Tr. 10/6 at 82-83 (Mignogna)).  The anticipated costs to complete the infrastructure were provided by a representative of Zeccola Builders.  (*Id.*).

(i)    Sales Comparison Approach

Mignogna utilized the sales comparison approach in assessing the fair market value of the Mortgaged Premises.  The sales comparison approach to market value is predicated upon prices paid and actual market transactions and current listings for comparable properties.  (Mignogna Report at 71).  The sales comparison approach is the most reliable approach to land value when a sufficient number of reliable, comparable sales are available.  (*Id.* at 71, Tr. 10/6 at 85 (Mignogna)).

Mignogna examined sales of approved/unimproved lots at six comparable developments as part of his sales comparison analysis:

| Date of Sale | Location | Total Price | Price per lot |
|---|---|---|---|
| August 2009 | Whitetail Run<br>Kenton Hundred, DE | $805,000<br>(23 lots) | $35,000 |
| July 2007 | Greene Hill Farms Estate<br>Smyrna, DE | $7.3 million<br>(138 lots) | $52,899 |
| Feb 2006 | Hickory Hollow<br>Smyrna, DE | $13 million<br>(325 lots) | $40,000 |
| listing<br>(1½ years) | Briarbush Road<br>North Murderkill Hundred, DE | $1.63 million<br>(56 lots) | $17,000 |
| listing since<br>Aug 2006 | Tower Hill Estates<br>South Murderkill Hundred, DE | $1.9 million<br>(65 lots) | $29,231 |
| listing<br>(1 year) | Chestnut Grove Farms<br>Dover, DE | $4.9 million<br>(179 lots) | $27,374 |

(Mignogna Report at 75-83, Tr. 10/6 at 85-91 (Mignogna)).

Mignogna also reviewed other multiple subdivision listings in Kent County, Delaware, and determined that an appropriate "asking price per lot" ranges between $16,204 and $37,500. (Mignogna Report at 84). After identifying the comparable properties, Mignogna further analyzed the comparable sales using a number of factors including financing terms, conditions of sale, market conditions, location, project size, property density and other factors. (Mignogna Report at 85-86; Tr. 10/6 at 92-94 (Mignogna)). Mignogna concluded that the appropriate unit rate for the 392 subject lots on the Mortgaged Premises is approximately $17,500.00 per lot under the sales comparison approach. (Mignogna Report at 88, Tr. 10/6 at 94-95 (Mignogna)). This results in a land value of $6,860,000.00 for the 392 lots at Old Country Farm. (*Id.*).

(ii)    Subdivision Development Approach

Mignogna also utilized a second methodology known as the subdivision development

analysis to value the Mortgaged Premises.  He described this approach as:

> Subdivision Development Analysis is a valuation approach that incorporates
> projected retail pricing of dwellings on the subject lots over the time period
> anticipated to sell out the development completely.  Deductions are made for the
> carrying costs typically involved in selling out a residential development, and the
> resulting net income streams are discounted to a net present value using an
> appropriate discount rate.

(Mignogna Report at 103).

The first step in a development analysis is to determine the income that will be generated

by the development.  (Tr. 10/6 at 102 (Mignogna)). Based upon an analysis of the local housing

market, Mignogna anticipated an average housing price of $235,000.00 in year one of the

development.  (*Id.*).  Based upon additional market and demographic research, Mignogna did not

anticipate any price appreciation for the Mortgaged Premises in 2011 and modest increases of 1%

and 2% in the years 2012 and 2013, respectively.  Mignogna thereafter projects annual price

increases of 3% beginning in 2014 and continuing through the year 2022 when the sales process

will be completed.  (Mignogna Report at 104, 112; Tr. 10/6 at 104 (Mignogna)).

Mignogna also calculates an absorption rate for sale of homes at the Mortgaged Premises.

Mignogna calculates sales of .67 units per month in year one.  His projected absorption rate

increases to one sale per month for the second year of the project, gradually increases to two sales

per month in year four, four sales per month in year eight and in each remaining year of the

projected selling period.  (Mignogna Report at 105; Tr. 10/6 at 105 (Mignogna)).

Mignogna also applies a discount rate to the projected cash flows from the Mortgaged

14

Premises.  The discount rate is the rate of return necessary to attract capital, and is influenced by the degree of risk, future inflation assumptions and the rates of return available from other investments.  (Mignogna Report at 108).  After reviewing industry discount rates in the Korpacz Real Estate Investor Survey and rates published in a Developer Survey found on realty.rates.com, Mignogna applies a discount rate of 16% for the Mortgaged Premises. (*Id.* at 109-110).

Mignogna's discounted cash flow analysis results in an "as is" fair market value for the remaining 392 lots at Old Country Farm of $6,470,000.00, which equates to a per lot price of $16,505. (*Id.* at 111; Tr. 10/6 at 110 (Mignogna)).

(iii)    Mignogna Conclusion regarding fair market value

Based upon the results from the sales comparison approach ($6,860,000) and subdivision development approach ($6,470,000), Mignogna concludes that the fair market value of the 392 remaining lots at Old Country Farm, including both improved and unimproved lots, is $6,500,000.00. (Mignogna Report at 118, Tr. 10/6 at 111 (Mignogna)).

(iv)    Mignogna analysis of liquidation value

Mignogna also analyzed the liquidation value of the Mortgaged Premises, assuming a limited marketing effort of only 90 days is allowed for the completion of a sale.  Mignogna testified that the liquidation value of the Mortgaged Premises is $3,900,000.00.  (Citizens Ex. 17, Tr. 10/6 at 112-113 (Mignogna)).

The Quinn Appraisal

Quinn also testified about the value of the Old Country Farms Subdivision at the hearing in this matter on October 6, 2010. Quinn did not use the sales comparison approach in his report because, in his opinion, there was insufficient market data over the last three years to perform the

15

necessary analysis. (Quinn Report at 50, Tr. 10/6 at 24 (Quinn)).

Instead, Quinn relied upon a subdivision development analysis. Quinn performed a market analysis and determined that homes in Old Country Farms Subdivision would sell at a weighted average sale price of $250,700, before adjustments, with an increase in the average sale price each year. (Tr. 10/6 at 25-27 (Quinn), Quinn Report at 52-54). He acknowledged that the weak market in the first year of the analysis would require the developer to provide discounts to buyers, which he calculated at approximately $13,400 per home, resulting in an average home price of $237,300 in year one. (*Id.*). He projected that the market would get better the next year, and reduced the incentives by half, resulting in an average home price of $251,521 in year two. (*Id.*). Starting in the third year, however, Quinn projected the market would return to normal so that incentives would end and the average sale prices would be supplemented by payment of lot premiums and upgrades. (Tr. 10/6 at 28-29 (Quinn), Quinn Report at 52-54). In year three, Quinn projects an average home price of $283,963. (*Id.*).

Quinn's development analysis also projects sales over a period of 13 years, with an absorption rate of 12 units in year one, 18 units in year two and 24 units in year three. (Quinn Report at 52, 54-55, Tr. 10/6 at 30-31 (Quinn)).

Quinn applies a discount rate of 12% to the projected cash flows from the Mortgaged Premises. (Quinn Report at 57, Tr.10/6 at 33-35 (Quinn)). Quinn testified he relied upon the Korpacz Investor Survey in setting his discount rate. (Tr. 10/6 at 64 (Quinn)). However, Quinn relied upon the national apartment market in the Korpacz Survey, which he acknowledged contains lower discount rates because apartments are considered less risky investments than a typical residential subdivision. (*Id.*).

Quinn conclusion

Quinn's subdivision development analysis assigned a value of $16,550,000.00 to the

Mortgaged Premises as of January 21, 2010. (Quinn Report at 59, Tr. 10/6 at 37 (Quinn).

## DISCUSSION

1.    The Motion for Additional Evidence

Citizens recently filed the Motion for Additional Evidence seeking Court permission to

submit an updated appraisal of the Old Country Farm Subdivision, which it claims will

demonstrate that the property has significantly decreased in value since the Mignogna Report was

prepared.  The Debtor objected to the Motion, arguing that reopening the record at this time would

cause undue prejudice to, and a place a substantial burden upon, the Debtor.  The Debtor argues

that granting the Motion for Additional Evidence would be an unnecessary expenditure of estate

and judicial resources.

Whether the record should be reopened to allow a party to submit additional evidence is

within the discretion of the trial court.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S.

321, 331-32, 91 S.Ct. 795, 802-03, 28 L.Ed.2d 77 (1971).  In deciding whether to reopen a case,

the court should consider (i) the burden, if any, on the parties and their witnesses, (ii) whether

undue prejudice may result if the relief is not granted, and (iii) concerns about judicial economy.

*Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 n.6 (3d Cir. 1975). *See also Joy Tech., Inc. v.*

*Flakt, Inc.*, 901 F.Supp. 180, 181 (D.Del. 1995) quoting 6A James Wm. Moore et al., *Moore's*

*Federal Practice*, §59.04[13] (2d ed. 1995) ("The trial court should consider the motion to reopen

'in light of all the surrounding circumstances and either grant or deny it in the interest of fairness

and substantial justice.'")

It is not appropriate to reopen the record in this case for additional appraisal information. The record has been closed for quite some time and the estate should not be required to bear the costs of procuring additional expert testimony on valuation.  More importantly, denying the Motion for Additional Evidence will not prejudice Citizens.  Citizens' proposed new evidence would reinforce the record already made by providing cumulative evidence of the depressed value of the Collateral, and would not alter my decision in this matter. This matter is ripe for adjudication and there is no benefit to expend additional judicial resources or estate resources to supplement the record.  The Motion for Additional Evidence will be denied.

2.    Plan Confirmation

The Debtor's Amended Plan can be confirmed only if it complies with the requirements of Bankruptcy Code §1129.  Citizens voted to reject the Amended Plan and filed an objection to confirmation.[10]  Citizens argues that the Amended Plan fails to meet the confirmation requirements of Bankruptcy Code §1129(a), specifically §1129(a)(3), because the Amended Plan was not filed in good faith; §1129(a)(7), because the Amended Plan will not provide Citizens with an amount that is not less than what Citizens would receive if the Debtor were liquidated under chapter 7; and §1129(a)(10), because no impaired class has accepted the Amended Plan.

The Debtor argues that the Amended Plan meets the requirements for confirmation under the "cramdown" provision of §1129(b), which provides in pertinent part:

**(b)(1)** Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and

---

[10]An objection to confirmation of the Amended Plan was also filed by Crouse Brothers, Inc. (D.I. 112), but that objection was withdrawn on July 12, 2010 (D.I. 140).

equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**(2)** For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

    **(A)** With respect to a class of secured claims, the plan provides--

        **(i)**    **(I)** that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

        **(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

        **(ii)** for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

        **(iii)** for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. §1129. The proponent of a "cram down" plan bears the burden of establishing the

plan's compliance with each of the requirements set forth in §1129(a), except §1129(a)(8),[11]

while the objecting party bears the burden of producing evidence to support its objections. *Matter*

*of Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr.D.Del. 2001).

Section 1129(a)(10)

      Section 1129(a)(10) provides that "[i]f a class of claims is impaired under the plan, at least

one class of claims that is impaired under the plan has accepted the plan, determined without

including any acceptance of the plan by any insider." 11 U.S.C. §1129(a)(10). Before a debtor

can use the "cram down" provisions to achieve plan confirmation over the objection of impaired

---

      [11]Section 1129(a)(8) sets forth the confirmation requirement that "[w]ith respect to each class of claims or interests - - (A) such class has accepted the plan; or (B) such class is not impaired under the plan. 11 U.S.C. §1129(a)(8).

classes, it must satisfy §1129(a)(10) by garnering a vote in favor of the plan by at least one class

of impaired claims.  As the Third Circuit has explained:

> The purpose of  §1129(a)(10) is to provide some indicia of support for a plan of
> reorganization by affected creditors and prevent confirmation where such support
> is lacking.  *In re Windsor on the River Assocs.*, 7 F.3d [127] at 131 [8[th] Cir. 1993]
> (quoting *In re Lettick Typografic, Inc.*, 103 B.R. [32] at 38 [Bankr.D.Conn. 1989]).
> As such, §1129(a)(10) requires that a plan of reorganization pass muster in the
> opinion of creditors whose rights to repayment from the debtor are implicated by
> the reorganization.  By providing impaired creditors the right to vote on
> confirmation, the Bankruptcy Code ensures the terms of the reorganization are
> monitored by those who have a financial stake in its outcome.  Bankruptcy
> provides a framework for the consensual and cooperative reorganization of an
> insolvent debtor . . . .

*In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243-44 (3d Cir. 2004)(internal punctuation

omitted).[12]

"Impairment" is defined in Bankruptcy Code §1124, which provides, in part, that a class of

claims is impaired under a plan unless the plan "leaves unaltered the legal, equitable, and

contractual rights to which such claim or interest entitles the holder of such claim or interest."  11

U.S.C. §1124.[13]  "Artificial" impairment occurs when a plan imposes an insignificant or de

---

[12]Some commentators have criticized the policy underlying §1129(a)(10):
> There is no logical basis to make the validity of a cram down on one class turn on whether some
> other class, any other class, consents by the requisite majorities to accept some other treatment
> on their distinct claims. No justifiable policy is served by requiring a plan proponent to jump
> through this hoop. The practice of satisfying the one-consenting-class rule by counting the
> consent of a class whose legally dissimilar rights are only marginally affected makes the
> requirement a sham in any case. The one-consenting-class rule has out-lived any useful purpose
> it ever might have served and, as one of us [co-author Kenneth N. Klee] has previously noted,
> should be repealed.

Daniel J. Bussel and Kenneth N. Klee, *Recalibrating Consent in Bankruptcy*, 83 Am. Bankr. L.J. 663,
725 (Fall, 2009).

[13]The entire text of §1124 of the Bankruptcy Code provides as follows:
Except as provided in section 1123(a)(4) to his title, a class of claims or interests is impaired under a plan
unless, with respect to each claim or interest of such class, the plan:

(continued...)

minimis impairment on a class of claims to qualify those claims as impaired under §1124."

*Combustion Eng'g*, 391 F.3d at 243. The Third Circuit further explained:

> The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors. While there is nothing in either §§ 1129(a)(10) or 1124 expressly prohibiting a debtor from "artificially impairing" the claims of creditors, courts have found this practice troubling.

*Id.* The *Combustion Engineering* Court noted that courts have split over the issue of artificial impairment. One line of cases concludes that the plain language of §1129(a)(10) does not prevent a debtor from artificially impairing claims.[12] The other line of cases has determined that allowing debtors to manipulate impairment of a class to satisfy §1129(a)(10) "so distorts the meaning and purpose of [§1129(a)(10)] that to permit it would reduce (a)(10) to a nullity." *Windsor*, 7 F.3d at

---

[13](...continued)

(1)    leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

(2)    notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default-

    (A)    cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

    (B)    reinstates the maturity of such claim or interest as such maturity existed before such default;

    (C)    compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

    (D)    does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124.

[12]*See Combustion Eng'g*, 391 F.3d at 243 n.60 citing *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr.D.N.J. 2000) (deciding that "under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims."), *In re Duval Manor Assocs.*, 191 B.R. 622, 628 (Bankr.E.D.Pa.1996) (concluding that "artificial impairment, while perhaps philosophically not the better view, is nevertheless clearly permitted under the plain meaning of the statute"); *see also L & J Anaheim Assocs.*, 995 F.2d 940, 943 (9th Cir.1993) (holding that § 1124 does not differentiate between artificial and actual impairment of claims).

131 quoting *Lettick*, 103 B.R. at 38.[13]  In *Combustion Engineering*, the Third Circuit, found the

use of artificial impairment troubling, writing:

> Combustion Engineering made a pre-petition side arrangement with a privileged
> group of asbestos claimants, who as a consequence represented a voting majority
> despite holding, in many cases, only slightly impaired "stub claims." On the facts
> here, the monitoring function of § 1129(a)(10) may have been significantly
> weakened. *See generally John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park
> Assocs.*, 987 F.2d 154, 158 (3d Cir.1993) (stating § 1129(a)(10) "would be
> seriously undermined if a debtor could gerrymander classes"). This type of
> manipulation is especially problematic in the asbestos context, where a voting
> majority can be made to consist of non-malignant claimants whose interests may
> be adverse to those of claimants with more severe injuries.

*Combustion Eng'g*, 391 F.3d at 244.[14]  The *Combustion Engineering* Court remanded the case for

further consideration of "artificial impairment" under §1129(a)(10).  *Id.* at 245.

Here, the Debtor's Amended Report of Plan Voting (Ex. D-5) (the "Voting Report")

asserts that Class 1 (real estate tax claims) and Class 3 (the secured claim of KSJS) are impaired

---

[13]The *Combustion Eng'g* Court cited the following cases as examples of courts that found
artificial impairment to be troubling:
> *See, e.g., Windsor on the River Assocs. v. Balcor Real Estate Fin. ( In re Windsor on the River
> Assocs.),* 7 F.3d 127, 132 (8th Cir.1993) ("[F]or purposes of 11 U.S.C. § 1129(a)(10), a claim is
> not impaired if the alteration of rights in question arises solely from the debtor's exercise of
> discretion."); *Beal Bank, S.S.B. v. Waters Edge L.P.*, 248 B.R. 668, 690-91 (D.Mass.2000)
> (concluding 1129(a)(10) is not satisfied unless creditors' rights are "legitimately impaired" for a
> proper business purpose); *In re Daly*, 167 B.R. 734, 737 (Bankr.D.Mass.1994) ( "A Debtor may
> not satisfy § 1129(a)(10) by manufacturing an impaired class for the sole purpose of satisfying §
> 1129(a)(10)[.]"); *In re Lettick Typografic, Inc.*, 103 B.R. 32, 39 (Bankr.D.Conn.1989) ("While
> the debtor may have achieved literal compliance with § 1129(a)(10), this engineered impairment
> so distorts the meaning and purpose of that subsection that to permit it would reduce (a)(10) to a
> nullity.").
*Combustion Eng'g*, 391 F.3d at 243 n.61.

[14]Additionally, the *Combustion Engineering* Court recognized that artificial impairment of
classes to manipulate voting implicates the good faith requirement of §1129(a)(3). *Id.* at 246. Even
though the facts of this case do not set forth evidence of side deals or other arrangements that the
*Combustion Engineering* Court found problematic, the Debtor's attempt to engineer an impaired
accepting class cause me to question the Debtor's good faith.

classes that have voted to accept the Amended Plan. The Voting Report further notes that seven

creditors in Class 5 (general unsecured claims), which is also impaired, voted in favor of the

Amended Plan. Citizens, however, voted against the Amended Plan with two Class 5 ballots

representing its deficiency claims in the aggregate amount of $8,057,361.67. The Debtor noted

that the amount of Citizens' deficiency claims (if any) would be determined at the Confirmation

Hearing and, therefore, whether Class 5 had accepted the Amended Plan was an open issue.

Citizens argues that Classes 1 and 3 are not impaired or are artificially impaired under the

Amended Plan and, therefore, those votes do not satisfy §1129(a)(10). Citizens further argues that

the amount of its deficiency claims controls the vote of Class 5, and its vote against the Amended

Plan prevents Class 5 from satisfying the §1129(a)(10) requirement.

I conclude that it is appropriate to consider whether Classes 1 and 3 were artificially

impaired; that is, are Classes 1 and 3 impaired for a proper business purpose or solely to satisfy

§1129(a)(10)? *See Beal Bank*, 248 B.R. at 691, *Daly*, 167 B.R. at 736-377

Class 1 consists of the pre-petition real estate tax claims and other secured claims of

governmental units. The Class 1 claimants will retain their liens against the appropriate building

lots and, as each lot is conveyed, the conveyance will be subject to the lien, unless the Class 1

claimant is paid in cash at the time of the conveyance. (Ex. D-1, §3.1.1). The record does not

reveal how the Class 1 claimants' rights have been altered, if at all. "[A] plan which 'leaves

unaltered' the legal rights of a claimant is one which, by definition, does not impair the creditor."

*Solow v. PPI Enter. (U.S.), Inc. (In re PPI Enter. (U.S.), Inc.)*, 324 F.3d 197, 204 (3d Cir. 2003).

The Amended Voting Report states that Class 1 accepted the Plan through a vote by the

City of Clayton, which holds a $3,000 claim against the Debtor that is secured by an escrow

23

account in the amount of $5,084.26. (Ex. D-5, D.I. 70 Amended Schedule B). The record shows that the Debtor has the ability to pay the modest amount of the City of Clayton's claim in full on the effective date, and the claim would be deemed unimpaired. *See PPI Enter.*, 228 B.R. at 355.

Class 3 consists of the secured claim of KSJS in the amount of $119,514.00, which is secured by collateral with a value of $185,900.00 (Ex. D-5, D.I. 1, Schedule A Supp, Ex. A-2). The Amended Plan proposes that KSJS will receive a deed to its collateral in full satisfaction of its secured claim. Under these facts, it is does not appear that KSJS is in fact impaired.

The Debtor has not provided any evidence of a valid business purpose for "impairing" the Class 1 and Class 3 claims. Together, the circumstances indicate that Classes 1 and 3 are impaired solely to obtain the requisite vote to permit confirmation by cram down. *See In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr.S.D.N.Y. 1995) (deciding that the debtor failed to meet its burden of proving that a secured claim of $2,370 was impaired under the plan for any justifiable business reason and the court was convinced that the debtor proposed impaired treatment only to obtain a vote to satisfy §1129(a)(10)), *In re W.C. Peeler Co., Inc.*, 182 B.R. 435, 437 (Bankr.D.S.C. 1995) (deciding that a claimant owed less than $2,000 was not truly impaired when the debtor did not provide any economic justification why it could not pay the claimant with surplus rental income). *Cf. In re Global Ocean Carrier,* 251 B.R. 31, 42 (Bankr.D.Del. 2000) (rejecting a claim of artificial impairment upon concluding that the creditor was substantially impaired because the plan affected over $5.6 million in cash collateral (more than 10% of the creditor's outstanding loan balance), and deciding that the debtors demonstrated a reasonable basis for the impairment: the funds were necessary to meet the distribution requirements of the plan).

24

In sum, the Court finds that Classes 1 and 3 have been artificially impaired and their votes must be disqualified for purposes of determining whether the Debtor has obtained the affirmative vote of an impaired class as required by §1129(a)(10). This leads to an analysis of whether the votes of Class 5 can satisfy the §1129(a)(10) requirement.

Section 1129(a)(10) provides that the votes of insiders cannot be counted in determining whether a class has accepted the Plan. Class 5 includes the votes of Frank Zeccola and Lawrence Zeccola, Sr., whose votes cannot be counted since - - as officers and directors of the Debtor - - they are insiders pursuant to Bankruptcy Code §101(31)(B)(i) and (ii). Class 5 also includes the votes of FLZ Development, LLC, Zeccola Builders, Inc. and Huntington Development, Inc. These entities are "affiliates" of the Debtor pursuant to Bankruptcy Code §101(2)(B) and, therefore, insiders of the Debtor pursuant to §101(31)(E).

This leaves the votes of three entities in Class 5: Davis Bowen & Friedel, Inc. (with a claim of $14,119.85), Crouse (with a claim of $77,267.60), and Citizens (with a claim in an undetermined amount). (Ex. D-5). I now examine the valuation testimony to determine the amount of Citizens' Class 5 unsecured deficiency claim.

At the confirmation hearing, I noted that Citizens' appraisal of the Mortgaged Premises appeared to be too low, while the Debtor's appraisal appeared too high. (Tr. 10/21 at 80:19 - 81:2). Although both appraisers did their best in good faith to reach their conclusions, after further consideration of the two experts' testimony, I conclude that Mignogna's valuation is more in line with the current market conditions and, therefore, is more reliable for purposes of determining Citizen's unsecured deficiency claim. Mignogna relied upon both a Sales Comparison Approach and Subdivision Development Approach. I disagree with Quinn's

25

statement that there was insufficient market data to support a sales comparison approach, especially with the plethora of comparable residential developments surrounding the Old Country Farm Subdivision. Mignogna reasonably examined sales at comparable developments and analyzed those sales based on location, project size, property density, financing terms and market conditions. Moreover, in comparing both experts' Subdivision Development Approach, Mignogna's projections regarding anticipated market conditions appear more realistic. Finally, Quinn acknowledged that the discount rate he applied to his projected cash flows was lower because it was based upon a rate used in analyzing the market for apartments, rather than residential subdivisions.

Accordingly, for purposes of this confirmation analysis, and based upon the fair market value asserted in Mignogna's report, I conclude that the value of Citizens' Collateral as of the confirmation hearing date is no more than $6.5 million. Citizens' presented testimony that its total claim as of the confirmation hearing date is $14.7 million; therefore, Citizens' deficiency claim would be no less than $8.2 million. Clearly, Citizens' deficiency claim, which voted to reject the Amended Plan, controls the Class 5 vote. No impaired class of claims voted to accept the Amended Plan and the Debtor cannot achieve confirmation under the cram down provisions §1129(b), since it has not satisfied §1129(a)(10). The Debtor's request for confirmation of the Amended Plan will be denied.

3.    Motion to Change Vote

Bankruptcy Code §1126 provides that a class has accepted a plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of allowed claims held by voting creditors. 11 U.S.C. §1126(c). If Crouse's vote, based on a claim in the

26

amount of $77,267.60, was changed to vote in favor of the Amended Plan, the claim is not enough to change Class 5's rejection of the Amended Plan.  Because the size of Citizens' deficiency claim controls overwhelmingly the vote of Class 5 and prevents acceptance by two-thirds in amount, the Motion to Change Vote becomes meaningless. Therefore, the Motion to Change Vote will be denied as moot.

4.    Motion for Stay Relief

Citizens seeks relief from the automatic stay pursuant to Bankruptcy Code §362(d)(1) and (2) to allow Citizens to exercise its remedies against its collateral. Section 362(d)(1) and (2) provide as follows:

> (d)    On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2)    with respect to a stay of an act against property under subsection (a) of this section, if--
> (A)    the debtor does not have an equity in such property; and
> (B)    such property is not necessary to an effective reorganization;

11 U.S.C. §362(d).  Citizens argues that it lacks adequate protection of its interest in the Old Country Farm Subdivision because there is no equity and the Debtor has not made any payments on the debt. Citizens also argues that the property is not necessary for the Debtor's reorganization because the Debtor's Amended Plan cannot be confirmed.  Based upon the record made at the confirmation hearing, I conclude that Citizens has met its burden of proof under §362(g)(1) and the Debtor has failed to meet its burden of proof under §362(g)(2). Citizens is entitled to relief from the automatic stay pursuant to §362(d)(1) and §362(d)(2).  Consequently, the Stay Relief Motion will be granted.

27

**CONCLUSION**

For the reasons stated herein, the Court concludes that (1) the Motion for Additional Evidence will be denied; (2) confirmation of the Amended Plan will be denied because the no impaired class of claims has accepted the Amended Plan as required by §1129(a)(10), (3) the Motion to Change Vote will be denied as moot, and (4) Citizen's Stay Relief Motion will be granted.

An appropriate order follows.


BY THE COURT:


KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE


Dated: March 9, 2012